UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BUSINESS INTEGRATION SERVICES,
INC.,

                Plaintiff,

-v-

AT&T CORP.,

                Defendant.

Index No. 06-CV-6186 (JGK) (MHD)


**REPLY MEMORANDUM OF LAW OF DEFENDANT AT&T CORP. IN FURTHER
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Judith A. Archer (JA-4446)
Sarah E. O'Connell (SO-0928)
Fulbright & Jaworski L.L.P.
666 Fifth Avenue
New York, New York 10103
Tel.:  (212) 318-3000
jarcher@fulbright.com
soconnell@fulbright.com
*Attorneys for Defendant AT&T Corp.*

65181056.2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT.........................................................................................1

BIS'S 56.1 STATEMENT DOES NOT RAISE ISSUES OF FACT  SUFFICIENT
TO DEFEAT AT&T'S MOTION........................................................................................2

ARGUMENT .......................................................................................................................4

    I.   THE FEBRUARY 3 E-MAIL IS NOT A SEPARATE AGREEMENT NOR A VALID
       MODIFICATION TO EITHER THE AGENCY OR ABN AGREEMENTS...................4

       A.   BIS's Cannot Contradict Its Complaint by Claiming That the February 3 E-mail
           Is a Separate Agreement, Not a Supplement to the ABN Agreement .......................4

       B.   The February 3 E-mail is Not a Valid Supplement to or Modification of the ABN
           Agreement Because it Is Not an Attachment to the ABN Agreement and Is Not a
           Writing Signed by Both Parties.................................................................................4

    II.  THE AGENCY AGREEMENT GOVERNS THE RELATIONSHIP BETWEEN
       AT&T AND BIS AS ITS AGENT .................................................................................8

    III. BIS MAY NOT RECOVER DAMAGES FOR LOST PROFITS...................................10

       A.   The Express Language of the ABN Agreement Precludes Recovery for Lost Profits
           of Any Kind .............................................................................................................10

       B.   Because the Damages BIS Seeks Are Not Direct Damages, Even Under BIS's
           Narrow Reading of the Limitation of Liability Provision, They Are Excluded ......10

       C.   If BIS's Lost Profits Are Not Excluded by Section 9.2, They Are Limited By
           Section 9.1 of the Limitation of Liability Provision ...............................................13

       D.   If, as BIS Now Argues, the February 3 E-mail Is a Wholly Separate Agreement,
           Then the Lost Profits BIS Seeks Are Unquestionably Consequential Damages
           and Are, Therefore, Barred .....................................................................................14

       E.   The Lost Profits Sought by BIS Do Not Meet the Kenford Test.............................15

CONCLUSION ....................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Am. List Corp. v. U.S. News & World Report,*
  75 N.Y.2d 38 (1989) .................................................................................... 11, 12

*Ashland Mgm't, Inc. v. Janien,*
  82 N.Y.2d 395 (1993) ......................................................................................... 12

*Bakhshandeh v. Am. Cyanamid Co.,*
  8 A.D.2d 35 (1st Dep't 1959) .............................................................................. 6

*Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York,*
  10 N.Y.3d 187 (2008) ......................................................................................... 12

*Business Integration Servs. v. AT&T Corp.,*
  06 Civ 1863, 2007, WL 2454107(S.D.N.Y. Aug. 21, 2007) .............................. 3

*Cappelli Enters., Inc. v. F&J Cont. Food Corp.,*
  16 A.D.3d 609 (2d Dep't 2005) ........................................................................... 8

*Care Travel Company, Ltd. v. Pan American World Airways, Inc.,*
  944 F.2d 983 (2d Cir. 1991) ............................................................................... 12

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,*
  74 N.Y.2d 475 (1989) ........................................................................................... 8

*DeMatteo v. DeMatteo Salvage Co., Inc.,*
  32 A.D.3d 817 (2d Dep't 2006) ........................................................................... 6

*DFI Communications Inc. v. Greenberg,*
  41 N.Y.2d 602 (1977) ........................................................................................... 5

*Graphic Scanning Corp. v. Citibank, N.A.,*
  116 A.D.2d 22 (1st Dep't 1986) ......................................................................... 14

*In re Best Payphones, Inc.,*
  01-B-15472, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) ........................ 11

*Karel v. Clark,*
  129 A.D.2d 773 (2d Dep't 1987) ......................................................................... 6

*Kenford Co., Inc. v. County of Erie,*
  67 N.Y.2d 257 (1986) ................................................................................... 12, 15

*Net2globe Int'l, Inc. v. Time Warner Telecom of N.Y.,*
  273 F. Supp. 2d 436 (S.D.N.Y. 2003).................................................................. 10

*Petrosino v. Bell Atlantic,*
    99 CV 4072, 2003 U.S. Dist. LEXIS 4616 (E.D.N.Y. Mar. 20, 2003) ..................................... 2

*Rose v. Spa Realty Assocs.,*
    42 N.Y.2d 338 (1977) ..................................................................................................... 6

*SEC v. Treadway,*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) .............................................................................. 2

*Seven-Up Bottling Co., Ltd. v. Pepsico, Inc.,*
    686 F. Supp. 1015 (S.D.N.Y. 1988) ................................................................................. 9

*Southwick Clothing LLC v. GFT (USA) Corp.,*
    99 CV 10452, 2004 WL 2914093 (S.D.N.Y. Dec. 13, 2004) ............................................ 4

*Stevens v. Publicis, S.A.,*
    50 A.D.3d 253 (1st Dep't 2008) ...................................................................................... 7

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931) ..................................................................................................... 13

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.,*
    487 F.3d 89 (2d Cir. 2007) .............................................................................. 11, 12, 13

STATUTES

Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 ......................... 7

N.Y. GEN. OBLIG. L. § 15-301 ........................................................................................... 5, 6

OTHER AUTHORITIES

Fed. R. Civ. P. 56 ............................................................................................................... 1

Fed. R. Civ. P. 56(f) ........................................................................................................... 3

Defendant AT&T, by its counsel, hereby submits this Reply Memorandum of Law in further support of its motion, pursuant to Fed. R. Civ. P. 56, for an order granting summary judgment in favor of AT&T and dismissing the Complaint of Plaintiff BIS.[1]

## PRELIMINARY STATEMENT

BIS's opposition brief continues its retreat from its Complaint and from the facts. BIS already had backed away from its claim that AT&T had breached the Agency Agreement because that Agreement is dispositive of BIS's claims. Now, BIS retreats from the ABN Agreement because it, too, easily disposes of BIS's claim. To avoid the unambiguous provision in the ABN Agreement precluding BIS's claim for lost profits, BIS now claims that it is entitled to more than $30 million based on an alleged stand alone agreement in a one paragraph e-mail that is neither definite nor accepted, that explicitly refers to the Agency and ABN Agreements, and that fails as a modification of both. BIS also tries to escape the allegation in its Complaint that the e-mail "supplemented" the ABN Agreement because it cannot overcome the ABN Agreement's prohibition against supplementing or modifying in that way. But BIS's retreat has it backed against a wall for if, as it now claims, the e-mail is a stand alone agreement, then any lost profits under that "agreement" would be consequential damages – even as BIS defines them – of AT&T's alleged breach of the ABN Agreement, and would be barred by its limitation of liability provision.

Despite its shifting contract theories and "throw it against the wall to see if it sticks" opposition, BIS has raised no genuine issue of material fact sufficient to defeat summary judgment. There is no contractual basis for its future lost profits claim, and such a claim is wholly contingent on unfounded assumptions and speculative in any event.

Further, BIS does not even attempt to controvert the caselaw in AT&T's moving brief

---

[1] Defined terms herein shall have the same meanings as in AT&T's Memorandum of Law ("AT&T Mem.").

that establishes that an unjust enrichment claim may not be maintained in the face of a contract governing the subject matter of such a claim.  (AT&T Memo. at 32-33)  Thus, regardless of whether the operative contract is the Agency or ABN Agreement – or even the February 3 e-mail claimed by BIS – such contract governs BIS's right, if any, to relief herein.  Summary judgment should be granted dismissing the unjust enrichment claim.

As set forth below and in AT&T's Motion, AT&T is entitled to summary judgment because there are no issues of material fact that remain to be tried as to any of BIS's claims.

## BIS'S 56.1 STATEMENT DOES NOT RAISE ISSUES OF FACT SUFFICIENT TO DEFEAT AT&T'S MOTION

BIS goes to great lengths to avoid admitting the undisputed facts that AT&T has set forth. In many cases, BIS admits the proffered fact but then add some qualification or additional immaterial fact – apparently to diminish the impact of the admission.  Such qualified admissions are nonetheless admissions.  *See Petrosino v. Bell Atlantic,* 99 CV 4072, 2003 U.S. Dist. LEXIS 4616, *3, n.3 (E.D.N.Y. Mar. 20, 2003); *SEC v. Treadway*, 430 F. Supp. 2d 293, 300, n.4 (S.D.N.Y. 2006).

Unable to controvert certain damaging facts, BIS seeks to preclude AT&T from referring to certain evidence on the grounds that, BIS claims, it is "derived at least in part from AT&T's corporate counsel's alleged concerns about the ABN business model and cannot be offered into evidence for summary judgment or trial pursuant to Magistrate Judge Dolinger's Order dated August 21, 2007."  *See, e.g.,* Pl. St. ¶ 137.  BIS grossly overstates the August 21 Order and would have the Court exclude any fact or evidence that arose after or as a result of communications with AT&T counsel, regardless of the fact that they do not even mention or refer to such communications.  The August 21 Order was not that broad.  It states:

> [A] denial of at-issue waiver is appropriate on the condition that defendant not put the communications 'in issue' in defending this action.  Thus, defendant cannot assert, either on summary judgment or at trial, a defense of advice of counsel and it may not offer in evidence any testimony concerning the substance of

communications by its attorneys to other employees regarding the legal status of the contract or any concerns that the attorneys may have had about the legal implications of the contract. [FN2: Defendant's current position would thus require it to avoid relying on current deposition testimony suggesting that (a) the attorneys expressed such concerns and (b) the decision to terminate the contract was influenced by those concerns.]

*Business Integration Servs. v. AT&T Corp.*, 06 Civ 1863, 2007, WL 2454107, at *3 (S.D.N.Y. Aug. 21, 2007).   None of the facts or evidence set forth by AT&T refer to any legal communications, advice or concerns and none violate the August 21 Order.  As an example of BIS's overreaching, BIS tries to preclude AT&T from even referring to the May 25, 2004 letter in which AT&T directs BIS to cease marketing under the ABN Agreement.  That letter nowhere refers to legal concerns, issues, or communications and is referred to numerous times by BIS itself.  The fact that the letter may have come about after or as a result of communications with counsel is not mentioned in the letter and not implicated by the August 21 Order.[2]

BIS also seeks to exclude deposition testimony from Mr. Glackin that the February 3 e-mail did not supersede the Agency Agreement, which continued to apply to BIS.  AT&T cites two separate portions of Mr. Glackin's deposition, the first of which independently supports the fact and nowhere refers to any legal issue or communication.  BIS seeks to exclude the fact based only on the second citation, which came after questioning about an e-mail in which Mr. Glackin referred to a conclusion by AT&T corporate counsel.  Mr. Glackin's deposition testimony, however, stated his understanding that the BIS Agency Agreement was in force despite the February 3 e-mail, a fact that had nothing to do with any communication with counsel.

Finally, BIS sets forth its own additional statements of fact, none of which are material to the Court's determination of this motion and many of which are unsupported.  AT&T will

---

[2]  BIS also indicates it may request a continuance pursuant to Rule 56(f) for leave to submit evidence currently the subject of AT&T's pending Objections to the Magistrate Judge's Memorandum & Order dated April 23, 2008 in the event that the Court has any doubt that BIS has raised triable issues of fact. (Pl. Mem. at 2)  BIS has not submitted an affidavit in its opposition specifying  the reasons that it cannot present facts essential to justify its opposition as required by Rule 56(f), and seeks only to forestall summary judgment.

respond in its Response to Plaintiff BIS's 56.1 Statement.

## ARGUMENT

**I.   THE FEBRUARY 3 E-MAIL IS NOT A SEPARATE AGREEMENT NOR A VALID MODIFICATION TO EITHER THE AGENCY OR ABN AGREEMENTS**

**A.   BIS's Cannot Contradict Its Complaint by Claiming That the February 3 E-mail Is a Separate Agreement, Not a Supplement to the ABN Agreement**

BIS's opposition vacillates between arguing that the February 3 e-mail constitutes a separate agreement and that it is a valid modification to the ABN Agreement. Notably, however, BIS's Complaint only alleged causes of action for breach of the Agency Agreement and the ABN Agreement.[3] It does *not* allege a cause of action for breach of the February 3 e-mail. Specifically, the Complaint alleges that the terms and conditions of the ABN Agreement were supplemented by the February 3, 2004 e-mails. (Archer Dec. Ex. A ¶ 37) BIS's complaint does not allege that the February 3 e-mail is a separate agreement that gave rise to a separate cause of action for breach. BIS should not be permitted to abandon the allegations of its Complaint because it believes it expedient to do so to overcome summary judgment. *See Southwick Clothing LLC v. GFT (USA) Corp.*, 99 CV 10452, 2004 WL 2914093, *6 (S.D.N.Y. Dec. 13, 2004) (where plaintiff asserted existence of contract in complaint, then in opposition to motion for summary judgment claimed the existence of other written agreements, court held plaintiff "cannot survive a summary judgment motion by contradicting [its] own pleadings in an effort to raise a genuine issue of fact").

**B.   The February 3 E-mail Is Not a Valid Supplement to or Modification of the ABN Agreement Because it Is Not an Attachment to the ABN Agreement and Is Not a Writing Signed by Both Parties**

The February 3 e-mail does not constitute a valid modification of the ABN agreement. BIS does not dispute that the ABN Agreement unambiguously provides that it "SHALL NOT BE MODIFIED OR SUPPLEMENTED BY ANY WRITTEN OR ORAL STATEMENTS,

---

[3]   As noted in AT&T's opening brief, BIS has dismissed with prejudice the claim for breach of the Agency Agreement. (AT&T Mem. at 11)

PROPOSALS . . . NOT EXPRESSLY SET FORTH IN THE AGREEMENT OR AN ATTACHMENT." Archer Decl. Ex. E, § 13.10 (emphasis in original); Pl. Stmt. ¶ 47. It further provides that "any supplement to or modification of this Agreement must be in writing and signed by authorized representatives of both parties." Archer Decl. Ex. E, §13.1; Pl. Stmt. ¶ 46. There is no dispute that the February 3 e-mail, which BIS alleges supplemented the ABN Agreement (Archer Decl. Ex. A, ¶ 37), fulfills none of these requirements.

BIS ignores this unambiguous language, instead relying on New York General Obligations Law § 15-301 to argue that there need only be a writing signed by the party against whom enforcement is sought. But BIS misreads the statute, which, by its terms, applies to an agreement that "contains a provision to the effect that it cannot be changed orally . . ." N.Y. GEN. OBLIG. L. § 15-301 (McKinney 2001). The ABN Agreement, however, goes well beyond the "no oral modification" clause contemplated by the statute, clearly and unambiguously defining the requirements for a valid modification, making BIS's argument wholly inapplicable.

BIS compounds its misreading of the statute by relying on a misapprehension of *DFI Communications Inc. v. Greenberg*, 41 N.Y.2d 602 (1977). (Pl. Mem. at 9) But *DFI* is very different from the situation here. *DFI* involved a claimed modification to a Stock Subscription Agreement, which stated that it may not be changed or terminated orally. 41 N.Y.2d at 604. Minutes of a Board of Directors meeting recited the detailed terms of the modification at issue therein and the Board's agreement to such modification, and such minutes were signed by the Corporate Secretary. *Id.* at 604-605. Although there was a *separate* employment agreement requiring any modifications to be in writing and signed by both parties, modification of the employment agreement was not at issue. *Id. DFI* thus fell squarely within § 15-301, unlike the ABN Agreement here. The *DFI* court also found the detailed terms of the modification and the formality of the Board minutes significant in reaching its conclusion, (*id.* at 605) distinguishing it

from situations like the one here and in *Bakhshandeh*, where there was "at best . . . an unsigned memorandum of the terms of a discussion indicating an intention to change the original agreement." *Bakhshandeh v. Am. Cyanamid Co.*, 8 A.D.2d 35, 37 (1st Dep't 1959).

BIS also claims that the determination of the adequacy of a writing to satisfy § 15-301 generally raises a triable issue of fact.[4]   However, the cases cited by BIS raising issues of fact with respect to modification address the authenticity of the writing and whether partial performance of an oral modification can lead to a valid modification.  *See, e.g., Karel v. Clark,* 129 A.D.2d 773 (2d Dep't 1987); *DeMatteo v. DeMatteo Salvage Co., Inc.*, 32 A.D.3d 817, 818 (2d Dep't 2006).   For purposes of this motion, AT&T is not disputing authenticity.   More importantly, there can be no dispute that the February 3 e-mail was not signed by BIS.  As to the issue of partial performance, as AT&T sets forth in its moving brief, the parties' course of performance did not modify the ABN Agreement.  *See* AT&T Mem. at 16.

BIS cites to *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338 (1977), for the proposition that estoppel or partial performance may lead to a binding modification even absent a writing.  (Pl. Opp. at 13)   As the *Rose* court made clear, however, such performance or estoppel must be otherwise incompatible with the parties' existing agreement.  *Id*. at 345.  As set forth in AT&T's moving brief, the parties' course of performance was not unequivocally referable to the modification and, in fact, was compatible with the parties' existing agreements.  (AT&T Mem. at 16).  The February 3 e-mail purports to address the commissions to be paid to BIS for sales made under its ABN Agreement and thus BIS could not have relied on it, an essential element of an estoppel finding.  *See Rose*, 42 N.Y.2d at 341.  The e-mail was sent well after BIS began making sales under the ABN Agreement.  Further, AT&T initially paid BIS commissions for ABN sales at the rates set forth in the Agency Agreement (*see* O'Connell Decl. Ex. A) and only paid

---

[4]  AT&T never asserts that the e-mail does not satisfy § 15-301, but rather cites the statute for the principle, not disputed by BIS, that provisions requiring written modifications are strictly enforced. ( AT&T Mem. at 15)

additional amounts well *after* it directed BIS to cease its sales and marketing efforts.  (*Id.*, Ex. B)

Because all actions taken by AT&T were compatible with the existing agreement, there could be

no course of performance or estoppel that would otherwise ratify the alleged modification.

BIS goes on to argue that the February 3 e-mail is, in fact, a signed writing and therefore

a valid modification.  (Pl. Opp. at 12)  The ABN Agreement, however, requires a writing signed

by *both parties*.  Archer Decl. Ex. E, § 13.1.  BIS makes much of the fact that a name at the close

of an electronic document may constitute a "signature."  (Pl. Mem. at 12-13)  The Electronic

Signatures in Global and National Commerce Act, 15 U.S.C.  § 7001, provides only that a

contract may not be denied legal effect solely because the signature is in electronic form.  This

does not, however, supplant the contractual requirement here that any modification must be

signed by *both parties*.  BIS also cites *Stevens v. Publicis, S.A.,* 50 A.D.3d 253, (1st Dep't 2008)

for the proposition that an e-mail exchange is sufficient to constitute a signed written

modification.  (Pl. Mem. at 11, 12)  In *Stevens,* unlike here, the parties exchanged a proposal, an

acceptance of the proposal, and an acknowledgement of the acceptance, with electronic

signatures on each.  *Stevens,* 50 A.D.3d at 255.  The court held that the e-mails constituted

signed writings for purposes of the statute of frauds.  *Id.* at 256.

Even if Mr. Glackin's name at the close of the e-mail constitutes a signature, however,

the February 3 e-mail does not fulfill the requirement of a writing signed by *both* parties.[5]

Unlike *Stevens,* BIS did not respond to the February 3 e-mail, and BIS therefore relies on the

initial e-mail from Chanh Nguyen as the "signed writing" on behalf of BIS, sent *before* Mr.

Glackin sent the alleged modification of commissions for sales under the ABN Agreement.  *See*

Pl. Mem. at 13.  BIS offers no authority for the nonsensical proposition that a "signature" prior to

offering of the alleged modification can constitute a signature agreement to the modification.

---

[5]  BIS also completely ignores the further requirement that only written terms in the ABN Agreement or an
attachment thereto be a valid supplement or modification.  Archer Decl. Ex. E, § 13.10

The February 3 e-mail is not definite in that it does not comply with the formalities set forth in the ABN Agreement for a valid modification.  The requirement of definiteness "assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement."  *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989) (cited in Pl. Mem. at 15-16).  None of the cases cited by BIS alter the result that the February 3 e-mail is not a valid modification because it is not a writing signed by both parties. In contrast, the cases cited by BIS deal with the definiteness of the *terms* of a contract.  *See, e.g. Cappelli Enters., Inc. v. F&J Cont. Food Corp.*, 16 A.D.3d 609, 610 (2d Dep't 2005).  But BIS cannot circumvent the modification requirements of the ABN Agreement by arguing that the February 3 e-mail is a separate agreement.

In a final detour, BIS discusses the admissibility of parole evidence, yet points to no ambiguities parole evidence would be needed to resolve.  (Pl. Mem. at 16)  The ABN Agreement unambiguously states the requirements for a valid modification.  Because BIS did not comply with these express requirements, no triable issue of fact exists as to whether the February 3 e-mail is a valid modification.

## II.   THE AGENCY AGREEMENT GOVERNS THE RELATIONSHIP BETWEEN AT&T AND BIS AS ITS AGENT

Contrary to BIS's assertions, the Agency Agreement – the only agreement giving BIS the authority to sell AT&T services – governs the relationship between BIS and AT&T, including BIS's sales under the ABN Agreement.[6]  *See* AT&T Mem. at 12.  While the ABN Agreement permits BIS to allow "Users" to access and use the services (Archer Decl. Ex. E at § 3.3) nowhere does it permit BIS to make *sales*.  The Agency Agreement applies to *all* sales made by BIS, whether under the Agency or ABN Agreement.   According to BIS, the parties fully

---

[6]   BIS sets forth a litany of differences between the Agency Agreement and the ABN Agreement and February 3 e-mail. (Pl. Mem. at 7-8) The majority of the differences arise from the "terms" of the February 3 e-mail, lending credence to the argument that, at best, the e-mail is a modification of the Agency Agreement.

intended for the ABN Agreement to be used as a sales vehicle, and AT&T was aware that BIS was not the end-user of the services.  (Pl. Mem. at 5, 7)  BIS believed that AT&T had assured BIS that it was not a problem for it to be both the agent and customer or record in proceeding with the ABN sales.  *See* O'Connell Decl. Ex. C at 2; Pl. St. ¶ 72.  Thus, BIS believed that AT&T would compensate BIS under the Agency Agreement despite the provision precluding payment of commissions to an agent for sales purchased in its own name.  *See* C. Nguyen Dep. at 129:15-130:9.  Even assuming that BIS correctly concludes that despite AT&T's agreement to the ABN sales model, the Agency Agreement prevented BIS from being paid commissions on its ABN sales, if the February 3 e-mail were a valid modification it would modify only the Agency Agreement's prohibition on the payment of commissions on sales made by an agent in its own name.[7]  A modification would, by its nature, modify only the contradictory provision in an agreement, leaving everything else intact.  *See Seven-Up Bottling Co., Ltd. v. Pepsico, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988).

As AT&T established in its moving brief (AT&T Mem. at 16-17, 19), if the February 3 e-mail were a valid modification at all, by its terms it could only have modified the Agency Agreement.  BIS argues that the Agency Agreement could not apply because the February 3 e-mail would have said so, (Pl. Mem. at 24) but just the opposite is true.  The February 3 e-mail did not have to say "the Agency Agreement applies" because it was referring to that Agreement by reference to the annual contracted revenue and tier status.  (AT&T Memo. at 8)  It would have been redundant to say that the Agency Agreement applied.  Nor is the fact that the February 3 e-mail differs from the Agency Agreement dispositive — a proposed modification, by definition, changes existing terms.[8]  Further, as set forth in more detail in AT&T's Memorandum of Law,

---

[7]  As set forth in AT&T's Memo, the Agency Agreement permitted AT&T to take all the actions BIS alleges constitute a breach.  (AT&T Memo. at 20)

[8]  BIS spends a great deal of time arguing that there are triable issues of fact as to Messrs. Glackin and Farrell's ability to bind AT&T.  (Pl. Mem. at 19-22)  AT&T did not argue in its moving papers that Messrs. Glackin and

the parties' course of performance was unequivocally referable to the Agency Agreement – not the February 3 e-mail. (AT&T Memo. at 17-18)  The only commissions paid to BIS prior to the alleged breach were at the rate set forth in *the Agency Agreement*.  *See* O'Connell Decl. Ex. A. Thus, the conduct prior to the breach was unequivocally referable to the Agency Agreement.

## III.    BIS MAY NOT RECOVER DAMAGES FOR LOST PROFITS

### A.    The Express Language of the ABN Agreement Precludes Recovery for Lost Profits of Any Kind

The ABN Agreement expressly provides that "neither party shall be liable to the other party for any indirect, incidental, consequential, punitive, reliance or special damages, including, without limitation, damages for lost profits, advantage, savings or revenues *of any kind*. . ." Archer Decl. Ex. E, § 9.2 (emphasis added).  In quoting this section, BIS tries to narrow the limitation of liability by selectively omitting the italicized language, which makes clear that *any* claim for lost profits is barred.  *See* Pl. Mem. at 25.  This provision does not preclude liability for only one type of lost profits, but expressly and unambiguously precludes liability for lost profits *of any kind*.  BIS's attempt to avoid the effect of this provision by recasting its claim for lost profits as direct damages is negated by the express language of the agreement and AT&T is entitled to summary judgment dismissing BIS's claim for lost profits as a matter of law. *Net2globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (granting summary judgment dismissing claim for lost profits where limitation of liability provision expressly precluded such recovery).

### B.    Because the Damages BIS Seeks Are Not Direct Damages, Even Under BIS's Narrow Reading of the Limitation of Liability Provision, They Are Excluded

The New York Court of Appeals has recognized that the "distinction between general and special contract damages is well defined but its application to specific contracts and

---

Farrell could not bind AT&T,  assuming the February 3 e-mail is a valid modification.  The fact that Mr. Glackin did not have authority on his own, however, and that BIS was aware of that (Glackin Dep. at 213:4-13) simply adds to the lack of definiteness and finality of the February 3 e-mail as a modification.

controversies is more elusive." *Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 42 (1989).  BIS, however, has created its own bright line rule:  if the lost profits sought come from the contracting party rather than a third party, the damages are direct, not consequential.[9]  (Pl. Mem. at 25)  AT&T has seen no authority – because there is none – supporting this newly created "rule."

The appropriate distinction, while difficult to apply, is that between a definite obligation flowing directly from the provisions of a contract as opposed to a non-definite, contingent obligation as exists here.  BIS relies heavily on *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89 (2d Cir. 2007), in which the Second Circuit held that the lost profits sought by the plaintiff therein were direct damages.  *Tractebel*, however, is very different from the instant case.  The contract there included a termination payment provision, setting forth a formula to determine losses recoverable by the non-breaching party.  *See id.* at 108, n. 19.  The court recognized that because defendant sought "only to recover money that the breaching party agreed to pay under the contract, the damages sought [were] general damages," particularly because the damages were "precisely what the non-breaching party bargained for."  *Id.* at 109-110.  Although *Tractebel* involved estimating damages into the future, it did not involve third party contingencies that would determine whether damages occurred at all.

Because the damages sought by BIS do not flow from the express terms of the agreement, but are contingent on outside factors – sales to third parties of AT&T's ABN service – the damages sought are indirect lost profits, not general damages as BIS asserts.  *See In re Best Payphones, Inc.*, 01-B-15472, 2007 WL 1388103, *9 (Bankr. S.D.N.Y. May 8, 2007) (because agreement at issue did not require Debtor to pay specified sum, but rather fees based on the number of payphones and their usage, creditor's claim "to recover the benefits of that future performance minus the expenses saved . . . [are] for lost profits, the quintessential form of

---

[9]  BIS also relies on the fact that its expert referred in his report as direct damages, but that is dispositive of nothing.

consequential or special damages."). If BIS were to claim that AT&T had not paid it for sales of ABN service that it made prior to termination, those arguably could be direct lost profit damages. BIS is not claiming such damages. *See* Archer Decl. Ex. R. Instead, BIS seeks damages for sales and profits that it projects it *might have made*. Such damages do not flow directly because they may not occur. In *Care Travel Company, Ltd. v. Pan American World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991), plaintiff sought damages for sales it could have made absent defendant's breach. *Id.* at 994-995. The parties in *Care Travel* had an agreement to pay commissions based on sales made to third parties. *Id.* Despite BIS's bright line rule, *Care Travel* involved lost profits damages to be paid by defendant directly. The court properly addressed the claimed damages under the *Kenford* test for indirect lost profits. *Care Travel*, 944 F.2d at 994. Here, BIS seeks recourse for profits it claims it could have made absent the breach. Because the parties did not agree upon either an amount of damage or a formula for determining damages that is not contingent, the lost profits sought do not flow directly from the contract, and are, therefore, indirect.

In urging the Court to apply *Tractebel*, BIS ignores a long line of cases decided by the New York Court of Appeals which make no distinction between lost profits recoverable as general or as consequential damages. *See, e.g., Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York,* 10 N.Y.3d 187 (2008); *Ashland Mgm't, Inc. v. Janien*, 82 N.Y.2d 395 (1993); *Am. List*, 75 N.Y.2d at 43 (applying *Kenford* test to damages determined by formula in contract). The Court of Appeals routinely – in these cases and others – applies the *Kenford* test to claims for lost profits, without distinguishing between lost profits as direct or consequential damages. Following the authority of New York's highest court, the *Kenford* test should be applied to determine whether the lost profits sought by BIS are recoverable.

Even if the damages sought by BIS are direct damages, BIS has not proven the *fact* of

damage as required by *Tractebel*.[10]  BIS asserts that it has established the fact of injury because AT&T refused to provision approximately 450 service orders submitted by BIS and it was only four months into the 3-year term of the ABN Agreement.  (Pl. Mem. at 30)  While the failure to provision such orders *may* lead to direct damages assuming such failure were a breach and there was a valid commission agreement, it would not, however, prove the fact of damage with respect to the hundreds of thousands of customers to which BIS claims it *could* have sold services in the future -- the basis for BIS's lost profits claim.   There is no proof of any such sales, only assumption and speculation.  *Tractebel* holds that certainty, as pertaining to general damages, refers to the *fact* of damage, not the amount.   *Tractebel,* 487 F.3d at 110.   However, the *Tractebel* court recognized that the general rule that "speculative damages cannot be recovered, because the amount is uncertain. . . will generally be found applicable to such damages as it is uncertain whether sustained at all from the breach."  *Id.* at 110, n. 22 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931)).

### C.   If BIS's Lost Profits Are Not Excluded by Section 9.2, They Are Limited By Section 9.1 of the Limitation of Liability Provision

Even assuming BIS were correct that its lost profits claim is not barred by ABN Section 9.2, its claim is nonetheless limited.  Section 9.2's provision excluding recovery for lost profits of any kind is only one part of the "Limitations of Liability" section of the ABN Agreement.  *See* Archer Decl. Ex. E, § 9.0.  The ABN Agreement also limits recovery for direct damages – Section 9.1 provides that "either party's entire liability and the other parties exclusive remedies" shall be "limited to proven direct damages not to exceed per claim an amount equal to the total net charges incurred by customer for the affected service in the relevant country during the three

---

[10]  BIS asserts that AT&T's expert, Paul Charnetzki, acknowledged that BIS suffered some level of damage.  Pl Mem. at 30.  Contrary to BIS's assertion, however, Charnetzki testified only that the calculation of damages put forth by BIS's expert was overstated by 19-fold.  Charnetzki Dep. at 60:3-13.  Mr. Charnetzki does not opine as to whether BIS in fact suffered damages, rather that in his evaluation of certain assumptions made by BIS's expert, the damages were overstated.  *Id.*

(3) months preceding the month in which the damage occurred." Archer Decl. Ex. E, § 9.1(iv).

BIS has put forth no reason why, if it is right that its claim is for direct damages, this provision would not apply. Although BIS asserts that the "clear" intent of the limitation of damages clause is to prevent end users from suing for service outages, the ABN Agreement expressly applies the limitation in Section 9.1 to damages caused by "any service defect or failure, or for other claims arising in connection with any service *or obligations* under this agreement." *Id.* (emphasis added). Moreover, the authority cited by BIS only stands for the general proposition that limitation of liability provisions will not bar recovery for willful conduct or gross negligence. *See* Pl. Mem. at 28; *Graphic Scanning Corp. v. Citibank, N.A.,* 116 A.D.2d 22, 26 (1st Dep't 1986). Because BIS has not alleged, nor can it, that AT&T's conduct was willful or grossly negligent, even if BIS's claim for lost profits is not excluded by ABN Section 9.2 its damages are limited by Section 9.1.

> ### D.    If, as BIS Now Argues, the February 3 E-mail Is a Wholly Separate Agreement, Then the Lost Profits BIS Seeks Are Unquestionably Consequential Damages and Are, Therefore, Barred

As set forth above, BIS's assertion that lost profits constituting consequential or indirect damages are those recoverable from an arrangement collateral to the allegedly breached contract, not under the breached contract, is unsupported. *See* Pl. Mem. at 26-27. Were BIS correct that the February 3 e-mail is a separate agreement, however, BIS's theory of consequential damages would bar BIS from recovering the very damages it seeks. If the February 3 e-mail is a separate agreement from the ABN Agreement, commissions that BIS asserts it could have earned pursuant to the "February 3 e-mail Agreement" had AT&T not directed BIS to cease marketing under the ABN Agreement, arise under an agreement separate from and collateral to the ABN Agreement. Under BIS's theory, the loss of commissions on future sales stemming from AT&T's alleged breach of the ABN Agreement are consequential lost profits, therefore, barred even under BIS's reading of the limitation of liability provision. Archer Decl. Ex. E, § 9.2.

**E.      The Lost Profits Sought by BIS Do Not Meet the *Kenford* Test**

BIS does not argue that it has met the test for recovery of lost profits set forth by the Court of Appeals in *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261 (1986), but rather that the test is not applicable.  Because the damages sought by BIS are, in fact, indirect, the *Kenford* test governs the recovery of the lost profits sought by BIS.  As BIS implicitly acknowledges, the future lost profits it seeks are difficult to calculate, involve a new business, and are based on a number of assumptions over a long period of time.  *See* Pl. Mem. at 32.  BIS cannot, therefore, meet the stringent three-part test set forth in *Kenford*, and AT&T is entitled to summary judgment dismissing BIS's claims as a matter of law.

## CONCLUSION

For all of the foregoing reasons and the reasons set forth in AT&T's Memorandum and Motion, AT&T's motion for summary judgment should be granted in all respects and BIS's Complaint dismissed in its entirety because there are no genuine issues of material fact that remain to be tried as to any of BIS's claims.

Dated:  New York, New York                     Respectfully submitted,
        June 23, 2008

                                               By: _____
                                                   Judith A. Archer (JA-4446)
                                                   Sarah E. O'Connell (SO-0928)
                                               FULBRIGHT & JAWORSKI L.L.P.
                                               666 Fifth Avenue
                                               New York, New York  10103-3198
                                               Telephone:  (212) 318-3000
                                               *Attorneys for Defendant AT&T Corp.*