UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BUSINESS INTEGRATION SYSTEMS, INC.,

               Plaintiff,

-v-

AT&T CORP.,

               Defendant.

Index No. 06-CV-1863 (JGK) (MHD)

## REPLY MEMORANDUM OF LAW OF PLAINTIFF
## IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

Shawn M. Perry (SP-2812)
PERRY & PERRY, PLLP
Suite 270, Parkdale 1
5401 Gamble Drive
Minneapolis, MN 55416
(952) 546-3555
shawn.perry@pppllp.com

# **TABLE OF CONTENTS**

I.   THE PRECLUSION ORDERS SHOULD NOT BE RECONSIDERED. ............................. 1

II.  THE LIMITATION OF DAMAGES CLAUSES ARE NOT APPLICABLE. ...................... 4

   A.   Section 9.1 is Not Applicable. ............................................................................................ 4

   B.   Section 9.2 is Not Applicable. ............................................................................................ 8

III. EVIDENCE RELATING TO THE SEC ACTION IS INADMISSIBLE. ....................... 10

I.      **THE PRECLUSION ORDERS SHOULD NOT BE RECONSIDERED.**

In a last ditch effort to overturn this Court's prior preclusion Orders, Defendant launches a rhetorical assault claiming (1) Plaintiff has "distort[ed] the Magistrate's previous Order beyond recognition;" and (2) that AT&T only seeks clarification of the *scope* of the Orders (Def. Opp. Mem. [Dkt. No. 130], at p. 1)[1]  Defendant makes these claims despite (1) its nearly identical interpretation of the preclusion Orders in every brief it filed with the Court on this issue since 2007[2] and (2) asks the Court to essentially reverse the preclusion Orders in its own motion *in limine*.

Defendant's current "interpretation" of the breadth of the preclusion Orders is contrary to *its own brief* in support of *its own pending Motion in limine*:

> ***As written, the August 21 Order could preclude AT&T*** from using these attorney-client communications ***or even referring to the substantive reason for termination, even if BIS argues contrary reasons to the jury***, as it has consistently done throughout this case . . .
>
> Now that BIS has the attorney-client communications it sought, ***AT&T moves for an order permitting it to tell the jury why it terminated the selling initiative***.
>
> \* \* \* \*
>
> Despite AT&T's subsequent production of privileged attorney-client documents to BIS, the ***broad preclusion*** of Magistrate Judge Dolinger's August 21 Order has not been modified. ***The August 21 Order continues to preclude AT&T from discussing such evidence at trial***.

(Def. Mem. 8/24/09 at pp. 2-3 and 9; *see also* similar statements at p. 11)(Emphasis added)

As in 2007 and 2008, Defendant argues the preclusion Orders are manifestly unfair and presents a parade of horribles which are premised on the argument that AT&T had reasons other than those asserted by its in-house counsel when it terminated the ABN program. The testimony

---

[1] Tellingly, Defendant's memorandum alternatively asks the Court to ***"reconsider"*** the preclusion Order if the law of the case doctrine applies to the Order. (Def. Mem. [Dkt. No. 130] at p. 5, n.2)

[2] *See, e.g.*, Def. Mem. [Dkt. No. 31], at pp. 6-7; Def. Reply Mem. [Dkt No. 38], at pp. 2-3; Def. Mem. [Dkt. No. 52], at p. 4, n.3.

of AT&T's own employees contradicts that assertion. Even though issues regarding the use of AT&T's logo by a rogue call center employee who was later fired, the use of TPV which had been previously approved by AT&T, and allegations of slamming which later proved to be unfounded, were mentioned in emails during the same general time frame, they were ***not*** the "negative ramifications" (i.e., the reasons for termination) referenced in AT&T's May 25, 2004 termination letter. Furthermore, as discussed in Plaintiff's opening brief, such allegations could have only been asserted if Defendant had pled illegality and/or an avoidance defense, which it did not.

Even if such defenses were before the Court, Defendant's argument is contrary to the established facts of the case. Each witness involved in the ABN termination decision-making process testified unequivocally that ***in-house counsel ordered*** suspension of marketing efforts in February and March, 2004 ***and termination of the program*** via the May 25, 2004 letter.  (See, e.g., Perry Reply Decl. Ex. 4, White Dep. at 46:10-47:15, 60:3-23;  Perry Reply Decl. Ex. 3, Quinn Dep. at 69:17-70:16; 71, 102:3-103:20;  Perry Reply Decl. Ex. 5, Glackin Decl., ¶¶ 37-42;  Perry Reply Decl. Ex. 2, Glackin Dep. 280:17-281:5.)  Contemporaneous business records establish the decision to shut down the ABN Agreement was based solely on instructions of in-house counsel and that the business people at AT&T had no choice but to follow counsel's instructions. (*See, e.g.*, Perry Reply Decl. Ex. 6)[3]

Even if AT&T's other alleged reasons had been pled as an avoidance, those reasons were either superseded by or inextricably intertwined with in-house counsel's involvement and as such are clearly barred by the preclusion Orders.[4] Citta, who ghost authored the May 25, 2004

---

[3] Exhibit 6 was submitted to the Magistrate Judge and was the key Glackin email upon which he found there had been a limited waiver of the attorney-client privilege.

[4] For example, the issue relating to the improper use of the AT&T logo was discussed in Glackin's email in the same breath as the instruction by in-house counsel to suspend sales under the ABN program. (Perry Reply Decl. Ex. 6)  *See also*, Archer Opp. Decl. [Dkt. No. 131-8] Ex.

2

termination letter, testified there were only three legal/compliance reasons upon which the termination letter was based, which he referred to as "negative ramifications":

> Q: What are the negative ramifications there were referred to in this letter?
>
> A: Remarketing branded services without being an authorized remarketer, invoicing – AT&T invoicing for these services, which violate the truth in invoicing regulation – truth in billing, I'm sorry. …
>
> Q: Anything else?
>
> A: Obviously, yes. The potential illegal rebates.
>
> Q: Were there any business reasons why – behind why the May 25, 2004 letter was sent independent of the three reasons you just listed?
>
> A: ***There weren't any additional business reasons, no***, that I'm aware of or recall.
>
> Q: And to develop the three, the list of three negative implications that you just listed right now, ***were those negative implications based on advice you received from legal counsel at AT&T***?
>
> MS. ARCHER: ***I'm going to object to the form and instruct the witness not to answer.***

(Perry Reply Decl. Ex. 1, Citta Dep. 69:15-70:9)(Emphasis added)[5]

The three "negative ramifications" listed by Citta are essentially the same alleged legal concerns articulated by in-house counsel. (*Cf.*, Citta's testimony above to the March 12, 2004 Glackin/Bree email chain produced by AT&T on December 23, 2008 (Archer Opp. Decl. [Dkt. No. 131-8] Ex. G)

---

G, a March 12, 2004 email chain in which issues such as LOA's and slamming were also discussed.

[5]The alleged "negative ramifications" are clearly claims of illegality or avoidance which is designed to present the jury with the specter that the ABN business model was not compliant with law despite AT&T's failure to plead illegality or avoidance. Defendant's contention that it is not advancing an illegality argument is also contrary to its prior stated intention to do so: "***Any defense of illegality will be based on a court's determination, as a matter of law   * * *"*** (Letter from Judith A. Archer to Magistrate Judge Dolinger dated August 14, 2007, (hereinafter "Def. Letter Brief") at 5-6, emphasis added).

Citta's testimony also proves that the May 25, 2004 termination letter was ***exclusively based upon the very legal information barred by the preclusion Order***. His deposition testimony and counsel's instructing him not to answer clearly demonstrates AT&T benefited from its strategy of using its privilege as both a sword and shield. AT&T now wants to offer Counsel Dermot Bree's emails and AT&T's "other" alleged reasons for termination as evidence to establish the very illegality/avoidance defenses it abjures despite having (1) waived such defenses, (2) failed to produce all documents on the subject matter from its privilege log, (3) prevented Plaintiff from fully questioning Citta; and (4) effectively prevented Plaintiff from deposing other important witnesses on the subject in reliance on the preclusion Orders still being in effect. (Perry Decl. ¶ 4)

The prejudice to Plaintiff would be legion if the Court were to now reverse the preclusion Orders when Plaintiff was blocked from conducting in-depth discovery on those issues and did not seek further discovery in reliance on the preclusion Order.

## II. THE LIMITATION OF DAMAGES CLAUSES ARE NOT APPLICABLE.

### A. Section 9.1 is Not Applicable.

Defendant argues that Section 9.1(iv) of the ABN Agreement caps Plaintiff's damages. Even if the Agreement is examined on its four corners, Defendant's interpretation would render the contract illusory, yield an absurd result and violate New York law. Moreover, Defendant's interpretation becomes nonsensical when considering that the Agreement was in actuality a sales vehicle and the promise to pay commissions was in a separate document with no limitation of damages provisions.

Defendant's passing citation to two New York opinions to suggest limitation of damages clauses are *ipso facto* enforceable in commercial contracts overlooks a significant body of contrary law which is applicable to the circumstances of this case.

"Limitations on a party's liability will not be implied and to be enforceable must be

4

clearly, explicitly and unambiguously expressed." *PRO Net, LLC v. ACC TeleCom Corp.*, 741 N.Y.S.2d 795, 796 (4th Dept. 2002). Limitation of liability clauses do not insulate a party from a breach of contract that is so fundamental as to constitute a total abandonment of its obligation under the contract or a willful bad faith breach of contract. *U.S. for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 167 (2d Cir. 1996). While the total abandonment rule is narrow, it bars the application of limitation of damages clauses when the breach of contract is "so unreasonable that [it] connote[s] a relinquishment of the contract by the contractee with the intention of never resuming it." *Id.*

This rule has been held to bar defendants from relying upon limitations of damages provisions in contracts where the defendant entirely failed to perform its obligations under the contract. *See, e.g., PRO Net, LLC*, 741 N.Y.S.2d at 796 (telecommunications carrier who failed to install internet access lines for business barred from asserting service outage limitations of damages clause against a claim for lost profits caused by late installation); *Graphic Scanning Corp. v. Citibank, N.A.*, 499 N.Y.S.2d 712 (1st Dep't 1986)(court refused to extend limitation of damages clause intended for service interruptions to a general breach of contract and also concluded that the repudiation of the agreement in order to substitute its own system was a willful breach sufficient to void a general limitation of damages clause).[6] These holdings are consistent with the maxim that "no man may take advantage of his own wrong, which is "[d]eeply rooted in our jurisprudence" and "has been applied in many diverse classes of cases by both law and equity." *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 127-128 (1966)(citing *Glus v. Brooklyn East. Term.*, 359 U.S. 231, 232-233 (1959)).

Similarly, limitations of damages clauses cannot be interpreted to render meaningless the

---

[6]While the limitations of damages clauses in *Pro Net* and *Graphic Scanning*, were limited to service outages, the *Graphic Scanning* Court held that the result would have been the same even if the clause was absolute. 499 N.Y.S.2d at 714.

5

non-breaching party's right to fundamental performance from the other party:

> Moreover, Citibank's interpretation of paragraph 8 would render superfluous the provision of the agreement allowing Citibank a limited right of termination after three years. ***Under its interpretation it could, with impunity, cause an interruption of service by a termination of the agreement at any time***. It is a generally accepted rule of construction that an agreement must be construed to accord a meaning and purpose to each of its parts. . . . . ***An interpretation which renders a clause absolutely meaningless should be avoided***.

*Graphics Scanning*, 499 N.Y.S.2d at 714 (citations omitted).[7]

The doctrine of good faith and fair dealing similarly would prevent such an unjust result by precluding Defendant from doing "anything which [had] the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Service* 87 N.Y.2d 384, 389-90 (1995).[8] Likewise, "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement." *Richbell Info. Servs. v. Jupiter Partners,* 765 N.Y.S.2d 575, 587 (1st Dept. 2003).

In the instant case, the parties entered into the ABN Agreement which had a three-year term and obligated BIS to pay approximately $450,000 per year (the net amount after applying discounts to the $1.8 million minimum annual revenue commitment ("MARC")) of long distance service per year for the entire three-year period. The last sentence of Section 9.1(iv) specifically states that the cap on damages "shall not limit customer's responsibility for the payment of all properly due charges under this agreement." (Perry Decl. 8/24/09 [Dkt. No. 101] Ex. 3)

AT&T's interpretation of Section 9.1(iv) would require BIS as the "customer" to pay

---

[7]The ABN agreement was likewise a three-year agreement with limited termination rights.

[8]Defendant implies that Plaintiff should have pleaded a separate claim for the breach of good faith and fair dealing to be able to argue the doctrine is applicable in this case. However, the duty is implied in every contract and when pled as a separate cause of action is routinely dismissed as redundant. *See, e.g., R.I. Island House, LLC v. North Town Phase II Houses, Inc.*, 858 N.Y.S.2d 372, 377 (2d Dept. 2008)

AT&T the MARC while shielding AT&T from its total abandonment of the contract and would render AT&T's obligations to provide service for the three-year fixed term of the ABN Agreement totally meaningless. The unfairness is magnified when considering that three months of billing is minute in comparison to the MARC over the entire three-year term of the contract.

Section 9.1(iv) makes sense and is fair in a situation involving service outages experienced by prototypical end users since it protects AT&T from common events endemic to providing telecommunications services, but makes no sense if AT&T abandons its obligations and fails to perform. It makes even less sense when considering the parties' intent to use the ABN Agreement as a sale vehicle.

In contrast, Plaintiff's interpretation in its opening brief applying the plain language of Section 9.1(iv) is faithful to the express words and meaning of the Agreement and recognizes how the parties' intended the ABN Agreement to be used while at the same time avoiding the absurd and illegal result that would follow from AT&T's proposed interpretation.

Defendant surprisingly argues that the Court should ignore as irrelevant the undisputed fact that BIS was using the ABN Agreement as a sales vehicle and not using the services itself simply because the ABN Agreement is silent on the subject: "BIS's argument that it was not receiving services from AT&T under the ABN Purchase Agreement is disingenuous, at best, especially in light of BIS's admission that the ABN Purchase Agreement said nothing about how BIS intended to use the services it purchased from AT&T." (Def. Mem. [Dkt. No. 130] at p. 14) For Defendant to argue that the Court should ignore the fact that the ABN Agreement was being used as a sales vehicle because it does not say so in its four corners not only defies common sense, contradicts AT&T's witnesses admissions on the record and contradicts AT&T's representations to this Court, it is also directly contrary to the Court's finding on summary judgment that "[t]here is no dispute that the plaintiff did in fact use the ABN as a sales vehicle and that the defendant knew it was doing so. . . ." (Transcript of Summary Judgment Ruling

7

[Dkt. No. 89], at p. 31:10-12) These admitted key facts are central to this litigation and cannot be assumed away by AT&T.

### B. Section 9.2 is Not Applicable.

Defendant persists in its quest to have the Court ignore the first clause of Section 9.2 which clearly limits its applicability to any "indirect, incidental, consequential, punitive, reliance or other special damages, including without limitation …;" and convince the Court that Plaintiff is claiming consequential damages, when it is not.

Like, Section 9.1, even if Section 9.2 applied, it cannot be used to shield Defendant from a fundamental abandonment of its contractual obligations. However, it is clear that Section 9.2 does not apply to this action in the first instance.

Defendant's argument that there is no legal authority to support Plaintiff's position is incorrect. *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89 (2d Cir. 2007) clearly supports Plaintiff's position that the damages Plaintiff claims are direct damages, as argued in Plaintiff's opening brief and on summary judgment. *See, also, Saey v. Xerox Corp.*, 31 F.Supp.2d 692, 701-702 (E.D. Mo. 1998)(holding claims for lost future commissions by agent whose agency agreement had been terminated were direct, not consequential damages). *Saey* is particularly instructive because it applied New York law and Xerox's agency agreement purported to limit consequential damages as does Section 9.2 of the ABN Agreement. *Id.* at 701-02.

AT&T's argument that lost profits are always consequential damages when based on future contingencies is not correct. If true, lost profits from lost future revenue could never be direct damages, which is contrary to the holding of *Tractebel Energy*.[9] Whether damages are

---

[9]The other cases cited by Defendant are *dicta* or wrongly decided. *Care Travel Company, Ltd. v. Pam American World Airways, Inc.*, 944 F.2d 983 (2d Cir. 1991) did not consider whether a claim for commissions was consequential damages; it merely analyzed the claim under the *Kenford* standard. *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10

8

direct does not depend on dogmatic classifications but upon the nature of the promise in a particular case.  Even one of the decisions ***cited by Defendant found a claim for future lost profits to be general (direct) damages*** and observed that "the distinction between general and special damages is well defined but its application to specific contract and controversies is usually more elusive." *American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 42-44 (1989).  Scholars have also pointed out that the distinction between the two types of damages is not to be made by applying dogmatic classifications:

> Some cases suggest that types of damages to a buyer--such as those arising from delay--are inherently consequential.  ***This is a fallacy.*** * * * * It follows that even the damages for loss of profits in *Hadley [v. Baxendale]* itself could have been direct, assuming that the carrier made an explicit promise to return the shaft without delay in order that the mill could operate and generate profits.  ***As Judge Cardozo once observed, the distinction between direct and consequential damages is not absolute but relative to circumstances, including the scope of the promise itself.***

1 White & Summers, Uniform Commercial Code § 10-4 (5th ed.)(Citations and footnotes omitted)(Emphasis added)

In the case at bar, AT&T promised to pay commissions for BIS's acquisition of ABN end user customers. AT&T's refusal to accept orders and failure to pay BIS the commissions it would have earned but for its breach obviously flows directly and naturally from AT&T's breach of contract, and is no different in principle than the direct damages claims in *Tractebel Energy, American List and Saey*.

---

N.Y.3d 187 (2008) is not remotely similar to the case at bar.  It held that an insurer's failure to promptly honor a business interruption claim permitted the insured to sue for lost consequential damages for the inability to reopen the business after a fire, which are clearly consequential damages. *Ashland Mgm't, Inc. v. Janien*, 82 N.Y.2d 395 (1993) presumed a claim for lost future royalties was subject to the *Kenford* rule in upholding the trial court's award of damages, but did not consider whether the damages were direct or consequential.  *In re Best Payphones, Inc.*, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) supports AT&T's argument, but is inconsistent with the holdings of *Tractebel Energy, American List and Saey*.

9

**III.    EVIDENCE RELATING TO THE SEC ACTION IS INADMISSIBLE.**

AT&T argues that it will not elicit testimony or offer the SEC press release for purposes of presenting character evidence or evidence of truthfulness, but rather claims such evidence is relevant to why Phong Nguyen left AT&T in 2000 and to AT&T's reasons for terminating the ABN program in 2004. (Def. Opp. Mem. [Dkt. No. 130] at pp. 18-19) These arguments are demonstrably incorrect.

Phong Nguyen's resignation from AT&T in 2000 had nothing to do with any of the issues in this case as evidenced by the fact that AT&T was reminded of the SEC matter in January 2003, (Perry Reply Decl. Ex. 7), eleven months *before* the ABN Agreement was approved and nevertheless approved the program.

Defendant's unsupported assertion that the SEC matter influenced the termination of the ABN program is contradicted by Citta's testimony set forth in Section 1(b), *supra* and is obviously untrue: The SEC press release on AT&T's exhibit list was issued in September 2004, five months *after* AT&T terminated the ABN program, and therefore could not have possibly played a role in the decision. In short, the evidence is clearly inadmissible.

Dated:  September 9, 2009
Minneapolis, Minnesota

Respectfully submitted,

PERRY & PERRY, PLLP

By  s/ Shawn M. Perry
    Shawn M. Perry (SP-2812)
Suite 270, Parkdale 1
5401 Gamble Drive
Minneapolis, MN 55416
(952) 546-3555

*Attorneys for Plaintiff*

10